IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RYAN K. SUMLIN, | ) | CASE NO.: 5:15-CR-319 |
| | ) | (CASE NO.: 5:21-CV-01975) |
| Defendant-Petitioner, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | MEMORANDUM OPINION |
| Respondent. | ) | AND ORDER |

This matter comes before the Court upon Ryan K. Sumlin's ("Petitioner" or "Sumlin") Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 (ECF #202) ("Petition" or "Motion").[1] The Petition asserts two grounds for relief.

The first ground for relief alleges that the Court's answer to a jury question regarding "but- for" causation of the victim's death related to charges of heroin and fenantyl distribution was erroneous and in violation of the requirements of *Burrage v. United States*, 571 U.S. 204 (2014). Petitioner asserts that the Court should have added more "context" in its answer, without providing any indication of what that "context" should have been. He characterizes this claim as

---

[1] Petitioner's motion was titled Petition for Writ of Habeas Corpus Pursuant to 18 U.S.C. § 2255, but it is clear Petitioner intended to invoke the provisions of Title 28, specifically, 28 U.S.C. § 2255 (ECF #202).

-1-

one based on "actual innocence." Petitioner's second ground asserts that his counsel was ineffective at trial for failing to object to the Court's proposed answer to the jury question on "but-for" causation.

The government filed a Response in Opposition (ECF #209), and Petitioner filed a Reply. (ECF # 212). This matter is now fully briefed and ready for disposition.[2] For the reasons set forth herein, the Petition (ECF #202) is DENIED.

## FACTUAL AND PROCEDURAL HISTORY

This case arises from the fatal drug overdose of Akron resident Carrie Dobbins ("Carrie") on March 28, 2015. On the day of her death, Carrie had ingested a lethal level and combination of the drugs heroin and fanantyl. The evidence produced at trial established that for a number of years preceding the events of this case, Carrie had developed a heroin addiction. Some months after Carrie's death, Petitioner Sumlin was charged in a three count indictment with supplying the heroin and fenantyl that resulted in Carrie Dobbins' death. A superseding indictment was later filed relating specifically to Sumlin. The case proceeded to trial on April 24, 2018.

The facts and evidence produced at trial established the following. In the very early morning of March 28, 2015, at just after 6:00 am, Carrie texted a telephone number identified at trial as belonging to Sumlin, asking if "TJ" could come "see" her. The number belonged to Sumlin. In her trial testimony, Carrie's sister, Amanda Kelly ("Amanda"), who had also abused

---

[2] The government's Response asked the Court to dismiss the petition on the ground that it was untimely, as it was filed more than a year after the Supreme Court denied Sumlin's petition for a writ of *certiorari*, on October 13, 2020 (ECF #189). The Section 2255 habeas petition was filed on October 19, 2021 (ECF #202). On January 14, 2022, Petitioner's recently-appointed counsel filed a Motion for Equitable Tolling or Alternative Motion to Withdraw (ECF #210), asking the Court to equitably toll the statute of limitations to permit the filing of Petitioner's Section 2255 motion and proceed to a decision on the merits. On January 19, 2022, the Court granted Petitioner's motion for equitable tolling, allowing a resolution on the merits. (ECF #211).

heroin in the past before she stopped using in 2015, identified Sumlin as "TJ," a heroin dealer who often used the name "TJ" when dealing drugs. Amanda was aware of this information because she knew Sumlin – she had gone to school with some of his relatives, had a past relationship with him, and had purchased heroin from him on a number of occasions.

Over the course of the early morning, Carrie and Sumlin exchanged several more text messages in which Sumlin agreed to deliver drugs to Carrie Dobbins' home, which she shared with her mother, Julie Dobbins. Following the text exchange, Carrie and Sumlin exchanged two telephone messages regarding Carrie's request that Sumlin not arrive at the home until Carrie's mother had left for work. Some time just before Julie Dobbins left for work, Julia noticed a dark Chrysler 300 parked in the neighborhood nearby. The evidence established that Sumlin drove a black Chrysler 300. Some time after Julie Dobbins had left, Sumlin arrived at the home.

Later that morning, Amanda Kelly, stopped by her mother's house to pick up some baby clothes. She had been driven there by her brother (and Carrie Dobbins' half-brother) Brian Kelly. When Amanda arrived at around 8:45 am, she saw Sumlin's black Chrysler 300 in the driveway. When Amanda entered the house, she saw Sumlin and her sister Carrie together. Amanda spoke briefly with Carrie and Sumlin, then picked up the baby clothes, and left at around 9:30 am. Amanda testified at trial that while she was at the home, she believed that Carrie was "on something," but did not know if it was alcohol, Xanax, or heroin. In the past, when Amanda had abused drugs, she had routinely purchased heroin from Sumlin. In fact, on some occasions, Sumlin had delivered heroin to Amanda at the same residence where Carrie was then living. During the trial, Brian Kelly, Amanda's brother and Carrie's half-brother, testified that he had spoken to Carrie briefly outside the house that morning while Sumlin was at Dobbins' house, and he also believed Carrie was under the influence of something, probably

heroin or fenantyl.  He also saw Sumlin's black Chrysler 300 in the driveway.

The trial evidence established that, after finishing work, Carrie Dobbins' mother, Julie, and her sister, Amanda, had returned to the Dobbins home some time between 5:00 and 5:30 pm.  When they arrived, they noticed the lights were on in Carrie's basement bedroom.  After a short time, Julie went to the basement to check on Carrie.  Finding her daughter passed out on the bed, Julie tried to wake her, but found her unresponsive.  Julie then called out to Amanda, who is a registered nurse, to come downstairs.  They turned Carrie over, removed her from the bed, and attempted CPR, to no avail.  Carrie had died.  They called 911, and the Akron Police arrived shortly afterward.

The evidence produced at trial established that, following Carrie's death, Akron Police Department Detective Mike Schmidt had visited an address believed to be Sumlin's address in Akron.  On arriving at that address, he saw a dark Chrysler 300 parked in the driveway.  Although the car was registered to Sumlin's mother, police records confirmed that Sumlin had previously been arrested while driving the vehicle in 2014.

These facts, and others learned by the police, as well as some others from earlier police records, turned the police's focus toward Sumlin as a suspect in Carrie's death.  On August 26, 2015, a grand jury indicted Sumlin for drug trafficking.  On August 17, 2016, a grand jury returned a superseding indictment against Sumlin and a number of others.  Later, after the others had pled guilty to the charges in the superseding indictment, the grand jury returned a supplemental indictment against Sumlin.

The case against Sumlin proceeded to a three-day jury trial, from April 24 to April 26, 2018, on the three charges of the supplemental indictment – Count 1: Distribution of a mixture or substance containing a detectable amount of fenantyl and heroin, in violation of 21 U.S.C. §

841(a)(1); Count 2: Possession with intent to distribute a mixture or substance containing a detectable amount of fenantyl, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and Count 3: Possession with intent to distribute a mixture or substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Sumlin was ultimately found guilty by the jury on all three charges. The jury also made a finding that the drugs supplied by Sumlin caused Carrie Dobbins' death.

During the trial, through cross-examination of one of the detectives assigned to the case and a review of other text messages from Carrie Dobbins' cell phones, Sumlin's counsel attempted to show that Carrie may have tried to obtain drugs from other sources on the day she overdosed, as there was evidence of earlier text messages and telephone calls between Carrie and other suspected drug dealers early in the morning on March 28, in which she appeared to be trying to obtain drugs. There was no evidence presented, however, that Carrie had actually obtained drugs from any of these other sources.

The evidence produced at trial showed clearly that Carrie Dobbins' death was caused by an overdose of fenantyl and heroin, and that it was Sumlin who provided the drugs that caused her death. As later noted by the Sixth Circuit in its decision affirming the convictions on Petitioner's direct appeal, it summarized the evidence presented on cause of death as follows:

> [T]he government[] presented proof from the autopsy and toxicology screening performed on Carrie following her death, which demonstrated to a medical certainty that a fenantyl overdose caused her death. In this regard, not only did the autopsy fail to show evidence of trauma, injury, stroke, heart ataack, or any other cause as rspnsible for Carrie's death, but, in fact, the only notable external or internal injury documented on her body was a small puncture would in her inner arm – a puncture that was consistent with recent drug use. Additionally, aside from showing that Carrie had recently used heroin and fenantyl, the forensic toxicology results revealed that she had a "lethal level" of fenantyl in her bloodsream at the time of death. Assessing these results, Dr. Sternbenz, the Chief Deputy Medical Examiner with the Summit County Medical Examiner's Office who performed the autopsy following Carrie's death, testified that "to a

> reasonable degree of medical certainty . . . Carrie died due to her active illicit drug abuse," and very likely died on March 28, 2015 because of the amount of fenantyl and heroin she had ingested. Adding external validity to these claims, the Akron police officers who found Carrie's body in her bedroom on the morning of March 28, 2015, reported that she died near a hypodermic needle, spoon, and a paper bindle – all paraphernalia used for the ingestion of drugs like fenantyl and heroin.

*United States v. Sumlin*, 956 F.3d 879, 892 (6th Cir. 2020) (omission in original).

The Sixth Circuit's decision went on to describe the substantial evidence produced at trial showing that it was drugs supplied by Sumlin that caused Carrie Dobbins' death:

> The government also introduced substantial evidence to prove beyond a reasonable doubt that Sumlin provided the drugs that caused Carrie's fatal overdose. Again, the text message evidence revealed the back-and-forth exchange between Carrie and Sumlin that lead to the drug deal. Despite Sumlin's contentions, this conversation was neither cryptic nor vague. Detective [Akron Police] Detective Scmidt testified that based on his extensive training and experience, he interpreted the conversation as referring to a drug transaction. Also, [Amanda] Kelly testified regarding Carrie's ongoing drug addiction, Sumlin's drug distribution activities, and past incidents in which both sisters bought drugs from Sumlin. Based on this evidence, it would have been reasonable for the jury to concluded that Carrie's text exchange with Sumlin referred to a drug transaction. . . .
>
> * * *
>
> Finally, Sumlin's behavior following Carrie's death could also reasonably be interpreted as suggesting his involvement. According to the testimony of Detective Schmidt, after searching online and confirming Carrie's death, Sumlin immediately changed his telephone number and instructed his contacts to "lose" the old number.

*Id.* at 893.

The jury ultimately found Sumlin guilty on all three Counts charged at trial. The jury's finding of guilty on Count 1 was accompanied by the jury's finding that the government had proved beyond a reasonable doubt that Carrie Dobbins' death resulted from the use of the heroin and fenantyl distributed by defendant Sumlin.

A few months later, on August 23, 2018, the Court sentenced Sumlin to life

imprisonment on Counts 1 and 2, in accordance with the "resulting in death" penalty enhancement provisions of 21 U.S.C. § 841(b), and 30 years on Count 3, to run concurrently.

Petitioner appealed his conviction to the Sixth Circuit Court of Appeals on August 26, 2018. None of Petitioner's arguments on direct appeal raised any issue as to the jury instructions given in the case or the Court's answers to any questions from the jury. *See United States v. Sumlin*, 956 F.3d 879, 882 (6th Cir. 2020). The Sixth Circuit affirmed Sumlin's convictions in all respects. Sumlin thereafter filed a petition for *certiorari* with the Supreme Court of the United States on July 17, 2020, which was denied on October 13, 2020. *Sumlin v. United States*, 141 S. Ct. 605 (2020).

On October 19, 2021, Sumlin, through newly-appointed counsel, filed this motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255, which the Court has allowed to proceed per its Marginal Entry Order of January 18, 2022 granting Petitioner's Motion for Equitable Tolling or Alternative Motion to Withdraw as Counsel. The subject of the Section 2255 motion relates only to Sumlin's conviction on Count 1, and particularly the Court's answer to a jury question relating to the "resulting in death" sentencing enhancement under 21 U.S.C. § 841(b).

At trial, after all of the evidence had been presented to the jury, and the case was ready to go to closing argument, the Court prepared its closing jury instructions. There was no dispute raised about either the jury instructions or the exhibits to be admitted. With respect to the jury instructions for Count 1, relating to causing Carrie Dobbins' death, the instructions were, in relevant part:

> In order to establish that the drugs distributed by the defendant resulted in the death of the victim, the Government must prove that the victim died as a consequence of her use of the drugs that the defendant distributed on or about the dates alleged in the indictment.

> This means that the Government must prove beyond a reasonable doubt that but for the use of the drugs that the defendant distributed, the victim would not have died. But-for causation exists where the use of the controlled substance combined with other factors to produce death, and death would not have occurred without the incremental effect of the controlled substance.
>
> The Government is not required to prove that the defendant intended to cause the death of the victim, or that her death was foreseeable by the defendant or others.

(ECF #177 PageID #1541-42).

Jury deliberations began late in the afternoon of April 26. Deliberations continued the next day. In the early afternoon of April 27, the jury sent a note to the Court with the question on which Sumlin's Motion now rests. On receiving the question, the Court convened the parties in the courtroom, outside the jury's presence, and addressed the jury question on the record as follows:

> THE COURT: And it says, "We are struggling with Count 1, Question 1A. There is reference in pages 34 and 35 to combining 'the controlled substance' with other factors to cause death and 'incremental effect.'"
>
> "Can we get an explanation of the but-for causation and how incremental effects should be thought of, and example of how it would be applied?"
>
> And then it's signed by the foreperson.
>
> Underneath it says, "we are struggling with 1A, as stated above."
>
> "What occurs if we do not come to a resolution on Part 1A?"

(ECF #178 PageID #1610).

The Court then had a discussion with counsel for the government and for Sumlin, in which all counsel agreed that the Court's proposed answer was an accurate statement of the law. In these discussions, the government had asked the Court to supplement that language to include "multiple sufficient causes language," in which the Court would instruct the jury that the "but-for" causation requirement could be met if the jury concluded that there were multiple "but-for"

causes, and "that the drug or drugs distributed by the defendant were an independently sufficient cause of the victim's death." Counsel for Sumlin objected to the government's proposed addition, stating, "Well, I'm objecting to supplementing the jury instructions right now. We have what the law is from the *Burrage* case.³ I would agree with what the Judge said, and not to supplement it any further."

After this discussion on the record, the Court gave the parties time to discuss and consider what language to propose for the Court to answer the question. The parties then discussed the matter off the record, with the end result being that Defendant Sumlin's counsel's view prevailed, in effect, that the Court would read to the jury what the Court had earlier stated, consistent with *Burrage*, and the government would withdraw its request for supplemental language. The Court then had the proposed answer typed out to later present to the jury.

The Court and the parties also discussed the jury's second question, "What occurs if we do not come to a resolution on Part 1A?" The parties agreed, as it was less than 24 hours after the jury had begun its deliberations, that an *Allen* charge or other instruction on a possible jury deadlock was premature. The Court indicated that it would tell the jury to continue to deliberate. Shortly thereafter, the Court brought the jury back into the courtroom, where the following exchange was put on the record, in accordance with the parties' agreement:

> THE COURT: The first thing I want to do is just read the question to you, and then I'll ask you if I correctly read the question. Okay?
>
> THE FOREPERSON: Okay.
>
> THE COURT: And it says, "We are struggling with Count 1, Question 1A. There is a reference in pages 34 and 35 to combining 'the controlled substance' with other factors to cause death and 'the incremental effect.'"

---

³ Referring to *Burrage v. United States*, 571 U.S. 204 (2014).

>"Can we get an explanation of but-for causation and how incremental effects should be thought of, and an example of how it would be applied?"

>And that's signed and dated today's date with your signature.

>And then down below it says, "we are struggling with 1A, as stated above."

>"What occurs if we do not come to a resolution on Part 1A?"

>And I'll answer that quickly right now: You continue to deliberate.

>But as to the first part, I correctly read your –

>THE FOREPERSON: Correct.

>THE COURT: I wrote this for you:

>"In this case, the but-for test means that the death of Ms. Dobbins would not have occurred without the use of the drugs distributed by the defendant.

>"Incremental effect means the drugs, controlled substance, increased the likelihood that death resulted from the use of the drug or drugs, controlled substance."

>I'll give you a copy of that. You can take that back.

(ECF #178 PageID #1616-17).

Now, after never raising any issue over either the Court's jury instructions or its answer to this or any other answer to a jury question at trial in his direct appeal, Petitioner files this 28 U.S.C. § 2255 habeas motion asserting that the Court should have provided more "context" to its answer to the jury on the "but-for" causation requirement of *Burrage*. Sumlin does not identify what the additional "context" should have been.

### STANDARD FOR RELIEF

A petitioner who moves to vacate, set aside, or correct a sentence pursuant to 28 U.S.C. § 2255 must demonstrate that: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the

sentence was in excess of the maximum authorized by law; or (4) it is otherwise subject to collateral attack. *See* 28 U.S.C. § 2255(a); *Hill v. United States*, 368 U.S. 424, 426-27 (1962). In order to prevail upon a Section 2255 motion, a petitioner must allege, and prove, "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law so fundamental as to render the entire proceedings invalid." *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003) (citing *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001)).

To "obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982). To prevail on a 28 U.S.C. § 2255 petition alleging *constitutional* error, a petitioner must establish an error of constitutional magnitude, which had a substantial and injurious effect or influence on the proceedings. *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999). To prevail on a 28 U.S.C. § 2255 motion alleging *non-constitutional* error, the petitioner must establish "'a fundamental defect which inherently results in a complete miscarriage of justice,' or an error so egregious that it amounts to a violation of due process." *Id.* (citation omitted). Thus, non-constitutional violations of federal law are generally not cognizable. *United States v. Timmreck*, 441 U.S. 780, 783-84 (1979).

## ANALYSIS

### I. Petitioner's Jury Instruction Claim

Petitioner's jury instruction claim is that the Court's answer the jury's question on "but-for" causation was erroneous because it did not "provid[e] the jury with context about how to apply the instruction" on "but-for" causation contained in the Court's initial instruction and "merely repeat[ed] the initial charge [leaving] the jury without the ability to make a reasoned

'but-for' decision" under *Burrage v. United States*, 571 U.S. 204 (2014)." Sumlin characterizes this claim as one asserting his "actual innocence."

Any claim which could have been raised on direct appeal, but was not, is procedurally defaulted. *Bousley v. United States*, 523 U.S. 614, 621 (1998). Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first show "cause" and actual "prejudice," *id.* at 622, or that he is "actually innocent." *Id.* (citing *Murray v. Carrier*, 477 U.S. 478, 485 (1986). The standard required to excuse a procedural default "is an intentionally high one" for the petitioner to meet, "for respect for the finality of judgments demands that collateral attack generally not be allowed to do service for an appeal." *Elzy v. United States*, 205 F.3d 882, 884 (6th Cir. 2000) (citing *United States v. Frady*, 456 U.S. 152, 165 (1982)).

With respect to the "cause and prejudice" procedural default standard, "cause for a procedural default on appeal ordinarily requires a showing of some external impediment preventing [a petitioner] from constructing or raising the claim." *Murray v. Carrier*, 477 U.S. at 492 (insert supplied); *accord Coleman v. Thompson*, 501 U.S. 722, 753-55 (1991) (requiring petitioner to show that "some objective factor external to the defense" impeded his efforts to present an issue for judicial review earlier, and holding that attorney ignorance or inadvertence is not "cause" unless it amounts to constitutional ineffectiveness).

Here, other than to the extent such a procedural default claim is folded into his ineffective assistance of counsel claim, Sumlin does not challenge the jury answer under a "cause and prejudice" standard, but rather focuses solely on a claim of "actual innocence."

A "claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim

-12-

considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993). To establish actual innocence, "petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley v. United States*, 523 U.S. at 623 (internal quotations omitted). To obtain review of a procedurally defaulted claim by asserting innocence, a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 496. The exception is narrow, and requires "factual innocence, not mere legal insufficiency." *Id.*

In this case, the evidence was overwhelming that the cause of Carrie Dobbins' death was an overdose of fenantyl and heroin, a fact that Sumlin does not dispute in either his motion or reply. *See also United States v. Sumlin*, 956 F.3d 879 (6th Cir. 2020). The evidence was also overwhelming that it was Sumlin, and no other, who sold Carrie the drugs that caused her death. *Id.* Again, neither Sumlin's motion nor his reply indicate any evidence to the contrary. Sumlin has come forward with no evidence to support a claim that he was "actually innocent" or that "no reasonable jury would have convicted him."

In now turning to Petitioner's claim that the Court's answer to the jury question on "but-for" causation was reversible error warranting collateral review, there is no claim that either the Court's initial instructions or its answer to the jury's question did not accurately state the law under *Burrage*. Petitioner's claim is that the Court should have provided more "context," without stating what that context should have been. This is hardly a showing sufficient to trigger collateral review of either the jury charge or the answer to the jury question:

> In order to obtain collateral relief for errors in a jury charge, a prisoner must show not merely that the instruction was erroneous, but that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." A jury instruction which the defendant did not challenge at trial is reviewed for plain error, and such error will be found only if, when read as a whole and in conjunction with other material charges, it substantially mislead

-13-

the jurors.

*Fair v. United States* 157 F.3d 427, 430 (6th Cir. 1998) (internal citations and quotation marks omitted).

Jury instructions, as well as responses to questions from the jury, are reviewed "as a whole in order to determine whether they adequately inform the jury of the relevant considerations and provide a sound basis in the law to aid the jury in reaching its decision." *United States v. Fisher*, 648 F.3d 442, 447 (6th Cir. 2011). "A district court's response to questions from the jury is reviewed under an abuse-of-discretion standard." *Id.* A court abuses its discretion if "there is evidence that the jury is confused over an important legal issue that was not covered by the original jury instructions," and the court fails to clarify the issue. *Id.* "A district court, however, should refrain from straying beyond the purpose of jury instructions by answering jury instructions that seek collateral or inappropriate advice." *Id.*

Sumlin makes no claim that either the Court's initial instructions or its answer to the jury's question misstate the law as stated in *Burrage*. He identifies no issue or point of law not addressed or covered in the initial jury instructions or the jury question answer. He suggests no "clarification" that should have been given as additional "context." Put simply, Petitioner has not identified any error at all, let alone one requiring reversal on collateral review.

## II. **Petitioner's Ineffective Assistance of Counsel Claim**

With respect to Petitioner's constitutional claim, asserting ineffective assistance of counsel under the Sixth Amendment, "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

A defendant seeking to establish an ineffective assistance of counsel claim must satisfy the standards set forth in *Strickland*. These standards apply to both trial and appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 260 (2000). Under *Strickland*, a defendant must show both (1) deficient performance by counsel, and (2) prejudice resulting from that inadequate performance:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannnot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687.

The inquiry under *Strickland* must be made in proper context, considering the prevailing circumstances and counsel's perspective at trial, and without relying on the 20/20 vision created by hindsight. *Id.* At 688-89. Judicial scrutiny of counsel's performance must be "highly deferential." *Id.* At 689. The Court should "presum[e] that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* As otherwise stated by the Sixth Circuit, "the threshold issue is not whether [defendant's] attorney was inadequate; rather it is whether he was so *manifestly* ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc) (emphasis in original).

Here, the record shows that, with respect to the jury question and answer issue, Sumlin's counsel affirmatively, and effectively, advocated for the Court to give the answer to the jury question that it did, adhering to the law set forth in *Burrage*, and that she successfully opposed the government's alternative proposed answer based on "multiple sufficient but-for causes" of death. Even if Sumlin now contends that the strategy of not straying beyond *Burrage* was error in hindsight, pursuing an erroneous strategy is not a sufficient basis to establish deficient

-15-

performance. *See Laffler v. Cooper*, 566 U.S. 156, (2012). Here, particularly as Sumlin has not identified or otherwise indicated the "context" that his counsel should have argued for, it appears his counsel's strategy was a sound one. Sumlin has made no showing of a viable claim of ineffective assistance of counsel at all, let alone a constitutionally recognizable one.

### III. Certificate of Appealability

Pursuant to 28 U.S.C. § 2253, the Court must determine whether to grant a certificate of appealability as to any of the claims presented in the Petition. Section 2253 provides, in part:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of a denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253(c).[4]

In order to make "substantial showing" of the denial of a constitutional right, as required under 28 U.S.C. § 2255(c)(2), a habeas prisoner must demonstrate "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

---

[4] Although the statute specifies that a certificate of appealability must be issued by a circuit justice or judge, the Sixth Circuit has held that this language includes both circuit and district judges. *See Lyons v. Ohio Adult Parole Authority*, 105 F.3d 1063 (6th Cir. 1997). The Federal Rules of Appellate Procedure explicitly include district judges under this authority as well. FED. APP. R. 22(b)(1).

Where a district court has rejected the constitutional claims on the merits, the petitioner must demonstrate only that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack*, 529 U.S. at 484.

For the reasons stated above, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right. Accordingly, the Court declines to issue a certificate of appealability.

## CONCLUSION

For the reasons set forth above, Petitioner's Motion to Vacate, Set Aside, or Correct sentence Pursuant to 28 U.S.C. § 2255 (ECF #202) is DENIED, and no certificate of appealability will be issued.

IT IS SO ORDERED.

DATED: April 8, 2022

DONALD C. NUGENT
United States District Judge